1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

EASTERN DISTRICT OF CALIFORNIA

8

9

10

11   WILLIAM ATCHERLEY,

12            Plaintiff,

13       vs.

14   EDGAR CLARK, et al.,

15            Defendants.

16

| | |
|---|---|
| ) | 1:12cv00225 LJO DLB PC |
| ) | |
| ) | |
| ) | FINDINGS AND RECOMMENDATIONS |
| ) | REGARDING DEFENDANT ANDERSON'S |
| ) | MOTION TO DISMISS |
| ) | (Document 68)_ |
| ) | |
| ) | TWENTY-ONE DAY OBJECTION PERIOD |
| ) | |

17      Plaintiff William Atcherley ("Plaintiff") is a prisoner proceeding pro se and in forma

18   pauperis in this civil rights action pursuant to 28 U.S.C. § 1983.  This action is proceeding on

19   Plaintiff's First Amended Complaint, filed on March 14, 2013, for violation of the Eighth

20   Amendment and negligence against numerous Defendants.  The action is currently is discovery.

21      On May 27, 2014, Defendant Anderson filed a motion to dismiss pursuant to Federal

22   Rule of Civil Procedure 12(b)(6).  Defendant Anderson also moves to strike the request for

23   punitive damages pursuant to Rule 12(f).

24      Plaintiff opposed the motion[1] on June 23, 2014, and Defendant Anderson filed her reply

25   on June 30, 2014.  Plaintiff filed an unauthorized surreply on July 24, 2014, though Defendant

26   did not move to strike the filing.  The motion is deemed submitted pursuant to Local Rule 230(l).

27

28   _____
[1] Plaintiff's pending motion to amend will be addressed by separate order.

1

**I.    ALLEGATIONS IN FIRST AMENDED COMPLAINT**

Plaintiff is currently incarcerated at Kern Valley State Prison in Delano, California.  The events at issue occurred while he was housed at Corcoran State Prison ("CSP").

Plaintiff alleges that in 2010, an MRI of his left knee showed a meniscal tear.  The prison doctor referred Plaintiff to an orthopedic specialist/surgeon for treatment.

On July 30, 2010, Defendant Alade[2] examined Plaintiff and recommended surgery.  On September 30, 2010, the prison primary care physician concurred with the recommendation and Plaintiff was again referred to Defendant Alade for surgery.

On January 18, 2011, Defendant Alade performed arthroscopic surgery on Plaintiff's left knee.  Defendant Alade ordered that Plaintiff use a wheelchair for two weeks and that his dressing be kept clean and dry until his next appointment.  Plaintiff was not informed of these orders and did not receive a copy of the orders until weeks after surgery.

Plaintiff explains that Defendant Alade examined him just prior to the surgery, and Plaintiff informed him of a previous infection.  Defendant Alade said that he would order some antibiotics for Plaintiff to take after surgery.  However, Defendant Alade forgot to order the antibiotics despite his knowledge of Plaintiff's previous infections.

When Plaintiff arrived back at CSP, he was taken to the CSP emergency room and examined by Defendant Clark.  Defendant Clark ordered a wheelchair for Plaintiff for two weeks.  He also wrote and approved a CDC 7410 chrono for the use of the wheelchair.  However, Defendant Clark failed to give Plaintiff a copy of the chrono, in violation of the regulations.  A copy of the wheelchair order and chrono were faxed to Defendant Barbolla, but Defendant Barbolla did not take any action on the order or chrono until after they had expired.  Plaintiff alleges that Defendant Barbolla was authorized and obligated to provide a wheelchair.

---

[2] Plaintiff alleges that Dr. Alade is a doctor with Pacific Orthopedic and was under contract with CDCR.

The order was also faxed to the 4A Clinic.  Since Plaintiff was not given a copy, he was not allowed to use a wheelchair and was forced to walk everywhere, against doctors' orders.

During Plaintiff's January 18, 2011, interview with Defendant Clark, Plaintiff told him of his previous infection.  Defendant Clark failed to order antibiotics and failed to order daily, or as needed, bandage changes.  Plaintiff alleges that Defendant Clark had authority to issue Plaintiff a wheelchair.  Upon information and belief, Plaintiff alleges that Defendant Clark had a duty to ensure that he had a wheelchair, antibiotics and an order for bandage changes.

On January 18, 2011, after Plaintiff's examination by Dr. Clark, Plaintiff was returned to yard 4A.  A copy of the wheelchair order and Defendant Alade's bandage change order were faxed to the 4A Clinic.  The orders are supposed to be reviewed by all RNs and LVNs on the 4A yard medical staff, including Defendants Holt, Ceballo, Anderson, Arabadia, Ross and Doe Defendants.  Defendants Holt, Ceballo and Anderson were the treating sources in the prison (other than the prison hospital) where wheelchairs could have been provided.  Each of these Defendants, in addition to the Doe Defendants, had the authority to either change Plaintiff's dirty bandages and/or to order a bandage change.

On January 18, 2011, after he returned to yard 4A, Plaintiff submitted a request to see the yard nurse or doctor.

On January 20, 2011, Plaintiff was called and escorted to the 4A clinic by Defendant Holt.  Plaintiff alleges that Defendant Holt violated the standard of care by (1) refusing to follow up on the wheelchair/walker problem, which she was obligated to do; and (2) using a pair of non-sterile gloves.  Defendant Holt put on the gloves, opened up Plaintiff's paper chart, flipped through it, opened the desk drawer, answered the phone and took notes.  She then took Plaintiff's vitals and without washing her hands or changing her gloves, she began to remove Plaintiff's bandages to examine the wound.  She accidentally pulled out a stitch and when Plaintiff pointed it out, Defendant Holt "touched the stitch in disbelief with her gloved finger and contaminated

glove." FAC, 9.  Without cleaning the wound, Defendant Holt put the old bandage back on and secured it with a new bandage.  Plaintiff was taken back to his housing unit.

On January 21 and 22, 2011, Plaintiff asked two Doe LVNs to change his dirty bandage. They refused, stating that they had no doctor's orders to do so.

On January 23, 2011, Plaintiff awoke with yellow drainage running down his leg from the area where the stitch was torn out.  He showed this to the two Doe LVNs, who told Plaintiff that it was normal.  Plaintiff attempted to explain that he had had this type of surgery before and that it was not normal.  Plaintiff requested that his bandage be changed and that he be taken to the prison hospital.  Both LVNs refused to send him to the hospital and refused to change his bandages.  However, one of them gave Plaintiff clean bandage material to change his own bandage.  Although these two Doe LVNs said that they did not have a doctor's order to change bandages, the medical records show that the order was faxed to the 4A medical clinic.

On January 24, 2011, the Doe LVNs again refused to change Plaintiff's bandages without a doctor's order, and refused to send Plaintiff to the prison hospital.  The bandage was dirty, wet and smelled, and had not been changed since the 20th.  These LVNs also refused to give Plaintiff new bandage material.

On January 25, 2011, Plaintiff was escorted to the 4A clinic in response to his January 23, 2011, health care request, by two Doe correctional officers, without his walker or his wheelchair.  Prior to the escort, Plaintiff informed both officers that he was mobility impaired, had just had surgery, needed a wheelchair and had a doctor's order for a wheelchair.  Unable to produce a copy of the chrono, Plaintiff was informed that he could walk to the clinic, or he would be considered to be refusing his appointment.  Plaintiff was forced to walk.

When he got to the clinic, he saw Defendant Ceballo, who changed Plaintiff's dirty bandage and said that the drainage was normal.  Defendant Ceballo also said that she would check on the wheelchair.  Plaintiff told Defendant Ceballo that the wound hurt more than it

should and that the drainage was not normal.  He requested that he be sent to the prison hospital and receive more bandages.  Defendant Ceballo did not order more bandages despite the drainage and refused to send Plaintiff to the prison hospital even though she had authority to do so.  Defendant Ceballo was also authorized to issue Plaintiff a wheelchair, but she refused to do so without an order.

On January 26, 2011, Defendants Rios and Torres escorted Plaintiff to the 4A clinic to see the dentist.  He told both officers that he needed a wheelchair, but they told Plaintiff that they didn't bring one with him and did not know of any orders.  Plaintiff was again told that he would walk or refuse the appointment.  After the appointment, Defendants Rios and Torres escorted Plaintiff back to his unit.  During the escort, Plaintiff fell down and hurt both knees on a dirt path.  The wet bandage got dirty and Plaintiff requested that he be taken back to the clinic to see Defendant Ceballo for a bandage change.  Defendants Rios and Torres refused because they were too busy.  Plaintiff alleges that Defendants Rios and Torres acted with deliberate indifference when they unnecessarily denied him the use of a wheelchair when it was clear that he had an injury and lacked safe mobility.  Plaintiff contends that staff, especially custody, can get a wheelchair at any time to transport inmates with medical issues.

After this incident, Plaintiff asked the second and third watch LVNs to change his bandage, and they refused.  One told Plaintiff that it was not her job to change it and the other told him that the bandage had already been changed.  They also refused to send Plaintiff to the prison hospital and would not give Plaintiff bandage material to change his own bandage.

On January 27, 2011, Defendant Barbolla came to Plaintiff's cell to examine Plaintiff's cell mate.  Plaintiff asked her about the wheelchair and she said that he didn't need one.  Defendant Barbolla told Plaintiff that if he did need one, he could use the one in the unit.

On the evening of January 27, 2011, Plaintiff asked the third watch nurse to send him to the prison hospital because he had started vomiting and having chills.  The Doe LVN said that she couldn't send him to the hospital but could get him an appointment with an RN.

On January 28, 2011, Plaintiff was again escorted to the clinic without a wheelchair or walker because the unit wheelchair could not be located.  Plaintiff saw Defendant Anderson, who changed Plaintiff's bandage and told him that the drainage was not normal.  Plaintiff told Defendant Anderson that he was supposed to have a wheelchair and that he received the chrono the night before, but the unit wheelchair could not be located.  Plaintiff asked Defendant Anderson to issue him a wheelchair and to send him to the prison hospital doctor.  Even though she was authorized to do both, she refused to do either and told Plaintiff that he would be seeing a doctor in three days.

Although Defendant Anderson changed Plaintiff's bandages, she did not order more frequent changes.  She also failed to send Plaintiff to the prison doctor for his infection in spite of the LVN's January 27, 2011, referral and Dr. Alade's orders to keep the dressing dry.

Plaintiff alleges that when he saw Defendants Holt, Ceballo and Anderson, they had his chart and therefore had the orders for the bandages and wheelchair.

From January 28, 2011, through February 1, 2011, Plaintiff requested assistance from every Doe LVN who came to his cell door on second and third watch.  Each refused to help Plaintiff, change his bandage, send him to the prison hospital or give him his own bandage material.  Plaintiff had no other way to obtain bandage material.

Defendant Arabadia was the RN on duty the most between January 18, 2011, and February 1, 2011.  During the times that she worked, Plaintiff often asked her for bandage changes or to be sent to the prison hospital.  She refused to get Plaintiff out of his cell to change his bandage.  Of all the Doe LVNs, Defendant Arabadia was the only one who gave Plaintiff his own bandage material.

On January 31, 2011, Plaintiff saw Dr. Galt in the clinic.  Dr. Galt removed the two remaining stitches, ordered the wheelchair extended, ordered that the bandage be changed daily and ordered antibiotics.

Also on January 31, 2011, the third watch Doe LVN refused to change his bandage, despite Dr. Galt's order, stating that the nurse should do it so she could keep track of the infection.  Plaintiff alleges that this was a violation of the doctor's orders.

On February 2, 2011, Plaintiff was examined by Defendant Holt.  Defendant Holt had a doctor look at Plaintiff's knee, and the doctor ordered that Plaintiff be taken to the prison hospital emergency room.  This was the first time he had seen a doctor since the surgery.  At the prison hospital, Plaintiff was seen by Dr. Moon, who wanted to admit Plaintiff to the prison hospital for IV treatment.  Plaintiff refused the treatment, so Dr. Moon ordered Plaintiff to be returned to the hospital in two days.

On February 4, 2011, Plaintiff returned to the hospital and when Dr. Moon saw Plaintiff's knee, he was taken to Mercy Hospital and admitted.  Over the next week, Plaintiff was treated with antibiotics and underwent other testing.  He was diagnosed with MSSA, septic/emesis arthritis and mild anemia.

On February 11, 2011, Defendant Alade performed a second surgery to clean out the infection caused by "poor wound care."  Instead of three small holes in his knee, Plaintiff now had a ten inch scar down the middle of his knee.

On February 19 and 20, 2011, Defendant Ross refused to change Plaintiff's bandage following the second surgery.  The daily bandage change was ordered by Dr. Kim on February 17, 2011, when he was released from the prison hospital.

From February 24, 2011, to August 5, 2011, Plaintiff underwent painful physical therapy at CSP three times a week.  Plaintiff was in a wheelchair until September 2011 and he used a walker until April 13, 2012, as he recovered from the surgeries and staph infection.  Plaintiff

1    alleges that the infection was caused by poor wound care and grossly inadequate medical

2    treatment by Defendants.

3          On March 30, 2011, Defendant Alade recommended a knee manipulation.  Plaintiff's

4    primary care physician at the prison, Dr. Ulit, agreed with the recommendation and submitted the

5    required paperwork for the procedure.  Without performing an examination or talking to

6    Plaintiff, Dr. Thiel denied the procedure because it was too expensive.

**II.      RULE 12(B)(6)**

7

8          A.      Legal Standard

9          To survive a motion to dismiss, a complaint must contain sufficient factual matter,

10   accepted as true, to state a claim that is plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662,

11   678, 129 S.Ct. 1937 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct.

12   1955 (2007)) (quotation marks omitted); Conservation Force v. Salazar, 646 F.3d 1240, 1241-42

13   (9th Cir. 2011); Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).  The Court must

14   accept the well-pleaded factual allegations as true and draw all reasonable inferences in favor of

15   the non-moving party.  Daniels-Hall v. National Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010);

16   Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007); Huynh v. Chase Manhattan Bank, 465

17   F.3d 992, 996-97 (9th Cir. 2006); Morales v. City of Los Angeles, 214 F.3d 1151, 1153 (9th Cir.

18   2000).  Further, although the pleading standard is now higher, the Ninth Circuit has continued to

19   emphasize that prisoners proceeding pro se in civil rights actions are still entitled to have their

20   pleadings liberally construed and to have any doubt resolved in their favor.  Wilhelm v. Rotman,

21   680 F.3d 1113, 1121 (9th Cir. May 25, 2012); Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir.

22   2012); Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010) (citations omitted).

23

24         B.      Prior Screening Order

25         On November 13, 2013, the Court issued an order indicating that it had screened

26

27   Plaintiff's complaint pursuant to 28 U.S.C. § 1915A and found that it stated numerous causes of

28

action.  The Court's conclusion was based upon the same legal standards as this 12(b)(6) motion, and the screening order may not be ignored or disregarded.  Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir. 2012); Ingle v. Circuit City, 408 F.3d 592, 594 (9th Cir. 2005).

To the contrary, the existence of a screening order which utilized the same legal standard upon which a subsequent motion to dismiss relies necessarily implicates the law of the case doctrine, and as a result, Defendant is expected, reasonably so, to articulate the grounds for her 12(b)(6) motion in light of a screening order finding the complaint stated a claim.  Ingle, 408 F.3d at 594; Thomas v. Hickman, No. CV F 06-0215 AWI SMS, 2008 WL 2233566, at *2-3 (E.D. Cal. May 28, 2008).

If the defendant, in a case which has been screened, believes there is a good faith basis for revisiting a prior determination made in a screening order, she must identify the basis for the motion, be it error, an intervening change in the law, or some other recognized exception to the law of the case doctrine.  Ingle, 408 F.3d at 594 ("A district court abuses its discretion in applying the law of the case doctrine only if (1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result.").

The duty of good faith and candor requires as much, and frivolous motions which serve only to unnecessarily multiply the proceedings may subject the moving parties to sanctions. Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc., 210 F.3d 1112, 1119 (9th Cir. 2000). Parties are not entitled to a gratuitous second bite at the apple at the expense of judicial resources and in disregard of court orders.  Ingle, 408 F.3d at 594 (The law of the case "doctrine has developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.") (internal quotation marks and citation omitted); Thomas, 2008 WL 2233566, at *3 (for important policy reasons, the law of the case doctrine disallows parties from a second bite at the apple).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Therefore, Rule 12(b)(6) motions which fail to acknowledge the prior procedural history and screening orders, and which fail to articulate the reasons for the motion in light of the prior relevant orders, implicate the law of the case doctrine, unnecessarily multiply the proceedings, and fall well below the level of practice which is expected in federal court.

With this standard in mind, the Court will now address Defendant's arguments.

C.      Analysis

        1.      *Eighth Amendment Legal Standard*

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must show deliberate indifference to his serious medical needs.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)) (quotation marks omitted).  The two-part test for deliberate indifference requires the plaintiff to show (1) a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain, and (2) the defendant's response to the need was deliberately indifferent.  Jett, 439 F.3d at 1096 (quotation marks and citation omitted).

Deliberate indifference is shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference.  Id. (citation and quotation marks omitted).  Deliberate indifference may be manifested when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.  Id. (citation and quotations omitted).  Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs.  Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

2.      *Discussion*

As previously noted, Plaintiff's First Amended Complaint was screened and the Court determined that it stated an Eighth Amendment medical claim against Defendant Anderson, as well as a medical negligence claim under state law.[3]

Defendant Anderson argues, however, that valid reasons exist for moving to dismiss the Eighth Amendment claim.  Specifically, Defendant Anderson contends that the Court "appears to have lumped Ms. Anderson's actions with those of other defendants who stand, even as alleged, in far different circumstances than she."  Mot., 2.  As Defendant Anderson is presenting arguments to the Court that do not simply rehash the findings in the screening order, the Court will consider her grounds for this motion.

Defendant Anderson argues that Plaintiff has failed to allege that she was subjectively aware of (1) his need for a wheelchair; (2) his need for bandage changes; or (3) his need to see a doctor.  Defendant Anderson believes that at most, Plaintiff has alleged that she should have been aware, but was not.  This, according to Defendant Anderson, amounts to nothing more than negligence.

Defendant Anderson is correct that an Eighth Amendment claim requires that a defendant be aware of the risk at issue.  Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004) ("'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'").

However, under the liberal pleading standards, Plaintiff's allegations are sufficient. Plaintiff alleges that he told Defendant Anderson that he was supposed to have a wheelchair, and had received the chrono the night before.  FAC, ¶ 52.  Defendant Anderson told Plaintiff that the drainage was not normal, but she refused Plaintiff's request to see a prison doctor and did not

---

[3]  Defendant Anderson only moves to dismiss the Eighth Amendment claim.

order additional bandage changes.  Defendant Anderson told Plaintiff that he would see the

prison doctor in three days.  FAC, ¶ 52.

From these allegations, Plaintiff has shown that Defendant Anderson, through either his

statements or her examination, knew that Plaintiff needed a wheelchair and that the drainage

from his knee was not normal.  Despite this knowledge, Defendant Anderson told Plaintiff that

he would see the doctor in three days and did not provide further assistance.  In other words,

even though Plaintiff does not allege that Defendant Anderson actually reviewed any orders, or

that he gave her the wheelchair chrono, his allegations are sufficient because *he told her* about

the wheelchair and *she observed* the abnormal drainage from his knee.  That Defendant

Anderson did not review the chrono is of no consequence given Plaintiff's statements and her

examination.

To the extent that Defendant Anderson contends that Plaintiff's allegations amount to

nothing more than a difference of opinion regarding treatment, her argument fails.  Defendant

Anderson argues that Plaintiff "wanted a wheelchair and felt he needed one, but did not get one."

Mot., 10.  However, Plaintiff's allegations go beyond allegations as to what medical treatment he

*would have liked*.  Rather, an *order* for a wheelchair was issued and Plaintiff told Defendant

Anderson that he received a chrono for the wheelchair the night before.

Defendant Anderson continues, "[h]e feels she should have ordered more bandage

changes, and she didn't. . .[h]e wanted to go to the doctor and she felt his trip in three days was

sufficient."  Mot., 10.  However, in light of Plaintiff's allegations that (1) Plaintiff told her that

he had a chrono for a wheelchair, but did not have a wheelchair; and (2) Defendant Anderson

noted that the drainage was not normal, Plaintiff's allegations demonstrate more than a mere

difference of opinion.

Finally, the Court rejects Defendant Anderson's suggestion that Plaintiff's allegations are

inadequate because they involve only a "single visit."  Mot., 2 (emphasis in original).  While

1  there may be situations where a single contact will not support a claim for relief, this case does

2  not present such facts.  Plaintiff alleges that he told Defendant Anderson that he had a chrono for

3  a wheelchair, but did not have one.  She examined him and noted that the drainage was not

4  normal, but did not order additional bandage changes.  Plaintiff requested to see a doctor, but she

5  told him that he would see one in three days.  A few days later, Plaintiff was admitted to the

6  hospital and diagnosed with MSSA.

7
8          Under these facts, Plaintiff shows (1) the existence of a serious medical need; and (2) a

9  purposeful failure to provide treatment.  Defendant Anderson's reliance on the limited scope of

10 her interaction with Plaintiff does not, *at the pleading stage*, negate Plaintiff's factual allegations.

11 **III.    MOTION TO STRIKE**

12         Defendant Anderson's motion to strike Plaintiff's prayer for punitive damages is based

13 on a finding that Plaintiff did not state an Eighth Amendment claim, and that the remaining

14 negligence claim under California law precludes a punitive damages award under these facts.  As

15 the Court has not granted the motion to dismiss the Eighth Amendment claim, it need not discuss

16 the motion to strike.  Plaintiff's prayer for punitive damages is proper as pled.

17 **IV.    CONCLUSION AND RECOMMENDATIONS**

18         Based on the foregoing, it is HEREBY RECOMMENDED that:

19         1.      Defendant Anderson's motion to dismiss be DENIED; and

20         2.      Defendant Anderson file a responsive pleading within thirty (30) days of the date

21 of service of the order adopting these Findings and Recommendations.

22
23         These Findings and Recommendations will be submitted to the United States District

24 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty

25 one (21) days after being served with these Findings and Recommendations, the parties may file

26 written objections with the Court.  The document should be captioned "Objections to Magistrate

27 Judge's Findings and Recommendations."  A party may respond to another party's objections by

28

filing a response within fourteen (14) days after being served with a copy of that party's

objections.  The parties are advised that failure to file objections within the specified time may

waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1157 (9th

Cir. 1991).

IT IS SO ORDERED.

    Dated:   **September 10, 2014**           /s/ *Dennis L. Beck*

                                          UNITED STATES MAGISTRATE JUDGE