1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11  WILBUR ATCHERLEY,                      )  Case No.: 1:12cv00225 LJO DLB (PC)
                                          )
12              Plaintiff,                 )  FINDINGS AND RECOMMENDATIONS
                                          )  REGARDING DEFENDANTS' MOTION
13        v.                               )  FOR SUMMARY JUDGMENT
                                          )  (Document 173)
14  CLARK, et al.,                         )
                                          )
15              Defendants.                )  THIRTY-DAY OBJECTION DEADLINE
                                          )
16                                        )
                                          )
17  _____       )

18          Plaintiff William Atcherley ("Plaintiff") is a prisoner proceeding pro se and in forma pauperis

19  in this civil rights action pursuant to 28 U.S.C. § 1983.  This action is proceeding on Plaintiff's Third

20  Amended Complaint, filed on January 26, 2015, for violation of the Eighth Amendment and

21  negligence against numerous Defendants.

22          On November 26, 2014, Defendants Abadia, Ceballos, Borbolla, Holt, Rios, Ross, Clark and

23  Torres filed the instant motion for summary judgment.[1]  After a stay was imposed and subsequently

24

25

26

27  _____

28  [1]  Defendants' motion included the required notice pursuant to <u>Rand v. Rowland</u>, 154 F.3d 952 (9th Cir. 1998).

lifted, Plaintiff opposed the motion on April 27, 2015.  Defendants filed their reply on May 19, 2015.  Pursuant to Local Rule 230(l), the motion is deemed submitted.[2]

As a threshold matter, the Court notes that Defendants have not moved for summary judgment on the non-medical negligence claim against Defendants Rios and Torres.  Although it appears to be an inadvertent mistake, the Court cannot consider granting summary judgment on those claims without a clear motion moving for such relief.  Because it appears to be an oversight, the Court will REOPEN the dispositive motion deadline to permit Defendants to move for summary judgment on these claims.  Defendants may either move for summary judgment based on the arguments and evidence already submitted, or they may submit new arguments and evidence.  Therefore, within thirty (30) days of the date of service of this order, Defendants must either inform the Court that they will stand on the arguments and evidence submitted, or submit any new arguments and/or evidence.  If Defendants submit new arguments and/or evidence, Plaintiff may file an opposition within twenty-one (21) days of the date of service of the motion.  Plaintiff may only file an opposition if Defendants present new arguments and/or submit new evidence, and his opposition may only address the new issues.

## I.   LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks

---

[2] Defendants' motion for summary judgment was filed prior to the filing of Plaintiff's Third Amended Complaint, which did not alter any allegations against them.  The Court granted summary judgment in favor of Defendant Alade on April 24, 2015.  The motion for summary judgment filed by Defendant Anderson will be addressed by separate Findings and Recommendations.  Additional Defendants have answered, though the Court has not opened discovery for these Defendants.  The newly-answering Defendants have a dispositive motion deadline of September 16, 2015.

omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If Defendants met their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a genuine issue for trial, and Plaintiff's filings must be liberally construed because he is a pro se prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## II.      SUMMARY OF PLAINTIFF'S ALLEGATIONS[3]

Plaintiff is currently incarcerated at Kern Valley State Prison.  The events at issue occurred while Plaintiff was incarcerated at Corcoran State Prison ("CSP") in Corcoran, California.

On January 18, 2011, Dr. Alade performed arthroscopic surgery on Plaintiff's left knee.  He ordered the use of a wheelchair for two weeks, and ordered that the dressing be kept clean and dry until the next appointment.  Plaintiff was not informed of these orders and did not receive a copy of the orders until weeks after surgery.

When Plaintiff arrived back at CSP, he was taken to the CSP emergency room and examined by Defendant Clark.  Defendant Clark ordered a wheelchair for Plaintiff for two weeks.  He also wrote and approved a CDC 7410 Chrono for the use of the wheelchair.  However, Defendant Clark failed to give Plaintiff a copy of the Chrono.  A copy of the wheelchair order and Chrono were faxed to Defendant Borbolla, but Defendant Borbolla did not take any action on the order or Chrono until after they had expired.  Plaintiff alleges that Defendant Borbolla was authorized and obligated to provide a wheelchair.  The order was also faxed to the 4A Clinic.  Since Plaintiff was not given a copy, he was not allowed to use a wheelchair and was forced to walk everywhere, against doctor's orders.

During Plaintiff's January 18, 2011, interview with Defendant Clark, Plaintiff told him of his previous infection.  Defendant Clark ordered antibiotics, but failed to order daily, or as needed, bandage changes.  Plaintiff alleges that Defendant Clark had authority to issue Plaintiff a wheelchair.

On January 18, 2011, after Plaintiff's examination by Dr. Clark, Plaintiff was returned to the 4A Yard.  A copy of the wheelchair order and Dr. Alade's bandage change order were faxed to the 4A Clinic.  The orders are supposed to be reviewed by all RNs and LVNs on the 4A yard medical staff, including Defendants Holt, Ceballos, Anderson, Abadia and Ross.  Defendants Holt, Ceballos and Anderson were the treating sources in the prison (other than the prison hospital) where wheelchairs

---

[3]  As noted above, the instant Defendants filed their motion for summary judgment based on Plaintiff's First Amended Complaint.  However, since the filing of the motion, Plaintiff has filed a Second and Third Amended Complaint.  The subsequent complaints added Defendants, but did not alter the allegations against the Defendants involved in this motion for summary judgment.  To avoid confusion, the Court will not include the newly named Defendants in this summary of facts.

could have been provided.  Each of these Defendants had the authority to either change Plaintiff's dirty bandages and/or to order a bandage change.

On January 18, 2011, after he returned to the 4A Yard, Plaintiff submitted a request to see the yard nurse or doctor.  On January 20, 2011, Plaintiff was called and escorted to the 4A clinic by Defendant Holt.  Plaintiff alleges that Defendant Holt violated the standard of care by (1) refusing to follow up on the wheelchair/walker problem, which she was obligated to do; and (2) using a pair of non-sterile gloves.  Defendant Holt put on the gloves, opened up Plaintiff's paper chart, flipped through it, opened the desk drawer, answered the phone and took notes.  She then took Plaintiff's vitals and without washing her hands or changing her gloves, she began to remove Plaintiff's bandages to examine the wound.  She accidentally pulled out a stitch and when Plaintiff pointed it out, Defendant Holt touched the stitch with her gloved finger and contaminated glove.  Without cleaning the wound, Defendant Holt put the old bandage back on and secured it with a new bandage.  Plaintiff was taken back to his housing unit.

On January 21, 22 and 23, 2011, Plaintiff asked numerous nurses to change his dirty bandage, but they refused, stating that they had no doctor's orders to do so.  On January 23, 2011, Plaintiff awoke with yellow drainage running down his leg from the area where the stitch was torn out.

On January 24, 2011, nurses again refused to change Plaintiff's bandages without a doctor's order, and refused to send Plaintiff to the prison hospital.  The bandage was dirty, wet and smelled, and had not been changed since the 20th.  These nurses also refused to give Plaintiff new bandage material.

On January 25, 2011, Plaintiff saw Defendant Ceballos at the clinic.  Defendant Ceballos changed Plaintiff's dirty bandage and said that the drainage was normal.  Defendant Ceballos also said that she would check on the wheelchair.  Plaintiff told Defendant Ceballos that the wound hurt more than it should and that the drainage was not normal.  He requested that he be sent to the prison hospital and receive more bandages.  Defendant Ceballos did not order more bandages despite the drainage and refused to send Plaintiff to the prison hospital even though she had authority to do so.  Defendant Ceballos was also authorized to issue Plaintiff a wheelchair, but she refused to do so without an order.

5

On January 26, 2011, Defendants Rios and Torres escorted Plaintiff to the 4A clinic to see the dentist.  He told both officers that he needed a wheelchair, but they told Plaintiff that they didn't bring one with him and did not know of any orders.  Plaintiff was again told that he would walk or refuse the appointment.  After the appointment, Defendants Rios and Torres escorted Plaintiff back to his unit. During the escort, Plaintiff fell down and hurt both knees on a dirt path.  The wet bandage got dirty and Plaintiff requested that he be taken back to the clinic to see Defendant Ceballos for a bandage change.  Defendants Rios and Torres refused because they were too busy.

After this incident, Plaintiff asked the second and third watch LVNs to change his bandage, and they refused.  One told Plaintiff that it was not her job to change it and the other told him that the bandage had already been changed.  They also refused to send Plaintiff to the prison hospital and would not give Plaintiff bandage material to change his own bandage.

On January 27, 2011, Defendant Borbolla came to Plaintiff's cell to examine Plaintiff's cell mate.  Plaintiff asked her about the wheelchair and she said that he didn't need one.  Defendant Borbolla told Plaintiff that if he did need one, he could use the one in the unit.

On the evening of January 27, 2011, Plaintiff asked the third watch nurse to send him to the prison hospital because he had started vomiting and having chills.  The nurse said that she couldn't send him to the hospital but could get him an appointment with an RN.

On January 28, 2011, Plaintiff was again escorted to the clinic without a wheelchair or walker because the unit wheelchair could not be located.  Plaintiff saw Defendant Anderson, who changed Plaintiff's bandage and told him that the drainage was not normal.  Plaintiff told Defendant Anderson that he was supposed to have a wheelchair and that he received the Chrono the night before, but the unit wheelchair could not be located.  Plaintiff asked Defendant Anderson to issue him a wheelchair and to send him to the prison hospital doctor.  She refused to do either and told Plaintiff that he would be seeing a doctor in three days.

Although Defendant Anderson changed Plaintiff's bandages, she did not order more frequent changes.  She also failed to send Plaintiff to the prison doctor for his infection in spite of the LVN's January 27, 2011, referral and Dr. Alade's orders to keep the dressing dry.

Plaintiff alleges that when he saw Defendants Holt, Ceballos and Anderson, they had his chart and therefore had the orders for the bandages and wheelchair.

From January 28, 2011, through February 1, 2011, Plaintiff requested assistance from every nurse who came to his cell door on second and third watch. Each refused to help Plaintiff, change his bandage, send him to the prison hospital or give him his own bandage material. Plaintiff had no other way to obtain bandage material.

On February 2, 2011, Plaintiff was examined by Defendant Holt. Defendant Holt had a doctor look at Plaintiff's knee, and the doctor ordered that Plaintiff be taken to the prison hospital emergency room. This was the first time he had seen a doctor since the surgery.

On February 4, 2011, Plaintiff was admitted to Mercy Hospital. Over the next week, Plaintiff was treated with antibiotics and underwent other testing. He was diagnosed with MSSA, septic/emesis arthritis and mild anemia.

On February 11, 2011, Dr. Alade performed a second surgery to clean out the infection caused by "poor wound care." Instead of three small holes in his knee, Plaintiff now had a ten inch scar down the middle of his knee.

On February 19 and 20, 2011, Defendant Ross refused to change Plaintiff's bandage following the second surgery, per doctor's orders.

## III.    UNDIPSUTED MATERIAL FACTS

Plaintiff has been an inmate incarcerated within the California Department of Corrections and Rehabilitation ("CDCR") since 1999. He was housed at California State Prison-Corcoran ("CSP") from February 19, 2010, through August 2011. Pl.'s Dep. 10:1-2; 11:13-21 (Mathison Decl., Ex A).

Defendant Dr. Clark has been working as a staff physician at CSP since 2008 and served as Chief Medical Officer at CSP in January and February 2011. Clark Decl. ¶ 1.

Defendants Abadia, Ceballos, Borbolla, Holt and Ross were nurses working at CSP in 2011. Defendants Abadia, Ceballos, Borbolla and Holt have been licensed registered nurse since prior to 2011, and Defendant Ross has been a licensed vocational nurse since 2009. Abadia Decl. ¶¶ 1-2; Ceballos Decl. ¶¶ 1-2; Borbolla Decl. ¶ 1; Holt Decl. ¶¶ 1-2; Ross Decl. ¶¶ 1-2.

7

Defendants Rios and Torres are correctional officers who have been working at CSP since prior to 2011.  Rios Decl. ¶ 1; Torres Decl. ¶ 1.

Dr. Alade performed arthroscopic knee surgery on Plaintiff's left knee on January 18, 2011, at San Joaquin Community Hospital.  Pl.'s Dep. 16:13-21; Clark Decl. ¶ 9.

Plaintiff returned to CSP on January 18, 2011, and was seen by Defendant Clark at the prison's hospital.  Plaintiff's condition was stable and he was scheduled to return to Dr. Alade for follow-up care in two weeks.  Defendant Clark prescribed augmentin and morphine, but he did not write an order for dressing changes.  Defendant Clark did not write an order for dressing changes because it is his experience that orthopedic surgeons do not want to have the dressing changed or altered where the patient is to return to see the orthopedic surgeon for further follow-up care.[4]  Clark Decl. ¶10; Mathison Decl., Ex. B, at 1-2.

Defendant Clark also wrote out and approved a Chrono for Plaintiff's use of a wheelchair until February 2, 2011.  Clark Decl. ¶ 10.  As is relevant to this action, Plaintiff saw Defendant Clark only once, on January 18, 2011.  Clark Decl. ¶ 11.

On January 20, 2011, Plaintiff was escorted to the 4A Clinic by Defendants Rios and Torres.  Plaintiff told them that Defendant Clark had ordered a wheelchair, but it had not yet been issued.  Plaintiff asked Defendants to use a wheelchair for the escort.  Defendants Rios and Torres told Plaintiff that he could not use a wheelchair because he did not have a copy of his Chrono.  Pl.'s Dep. 37:11-38:9, 43:3-25.

Defendants Rios and Torres have received training on the appropriate procedures and requirements for escorting inmates within CSP.  In order for an inmate to use a wheelchair during an escort, the inmate is required to have a valid Chrono.  Chronos or copies of Chronos are provided to inmates by medical staff in a process that is outside of the scope of Rios' and Torres' duties and

---

[4] Plaintiff attempts to dispute this by arguing that Defendant Clark said that he would order bandage changes, but failed to so do.  This does not dispute Defendant Clark's explanation.  Indeed, Plaintiff specifically states that he does not know why Defendant Clark did not order bandage changes.

responsibilities as correctional officers.  If an inmate had a Chrono, but did not actually have a wheelchair at his cell, then the inmate was authorized to be escorted by wheelchair and Rios or Torres would go to the clinic or another location to locate a wheelchair for use during the escort.[5]  Rios Decl. ¶¶ 2-4; Torres Decl. ¶¶ 2-4.

When Defendants Rios and Torres arrive at an inmate's cell for an escort, they are ready to proceed with moving the inmate.  If an inmate did not have a Chrono for a wheelchair but requested to use one, whether or not Defendants Rios or Torres would attempt to locate one depended on the particular circumstances existing at the time of the escort.  Defendants' attempting to locate a wheelchair and/or verify a Chrono necessarily delays the escort.  Rios Decl. ¶5; Torres Decl. ¶5. Defendants state that this delay may jeopardize the time for Defendants to complete other required tasks, or the timing for the event to which the inmate is being escorted, which in turn may raise safety or security issues for Defendants, inmates and staff.[6]  Rios Decl. ¶ 5; Torres Decl. ¶ 5.  If the circumstances were such that Defendants believed it would be appropriate to attempt to locate a wheelchair, they would do so.[7]  If an inmate refused to be escorted because he did not have a wheelchair, then the inmate was permitted to remain in his cell.  Inmates were never forced to walk to an appointment if they chose not to do so.  Rios Decl. ¶ 5; Torres Decl. ¶5.

Defendants Rios and Torres followed this practice at all times relevant during their 2011 escorts.  Rios Decl. ¶ 4; Torres Decl. ¶ 4.

Plaintiff was examined by Defendant Holt at the 4A Clinic on January 20, 2011.[8]  He arrived to the appointment in a wheelchair, and left the appointment in a wheelchair.  Pl.'s Decl. ¶ 9; Pl.'s

---

[5]  Plaintiff states that he is unable to admit or deny portions of this fact without additional discovery, but he has not made a proper request for discovery under Rule 56(d).  These facts are therefore undisputed.

[6]  Plaintiff denies this fact, but he does not provide evidence to support his denial.

[7]  Plaintiff denies this, simply stating that they did not have any discretion when Plaintiff informed them that he had an approved Chrono.  Again, he does not have evidence to support his denial.

[8]  Defendant Ceballos references an Exhibit A in her declaration, though no such exhibit is attached.  The exhibit is described as Plaintiff's Health Care Services Request Form.  The omission is harmless as both parties have provided the document elsewhere.  Defendant Holt also references an Exhibit A, described by her as the Health Care Request Form and

Dep. 52:23-53:17.  Plaintiff was in stable condition post-surgery and complained of tingling sensations in his left knee.  Holt Decl. ¶ 4; Mathison Decl., Ex. B, at 3.[9]  Defendant Holt examined the incision site and noted that the sutures were intact.

Defendant Holt noted that there were no signs redness or drainage at the site, and no signs or symptoms of an infection.  She referred Plaintiff to see a physician, with an appointment of January 31, 2011.  She also instructed Plaintiff on the use of his medications and told him to submit another Health Care Request to return for further evaluation if he experienced swelling, pain, decreased range of motion or signs or symptoms of an infection.  Holt Decl. ¶ 4; Mathison Decl., Ex. B at 4.

Defendant Holt wore non-sterile disposable gloves during her examination of Plaintiff on January 20, 2011.  It was her practice, and a standard practice for nurses working as the clinic triage nurse, to wear these gloves at all times during an examination.  The gloves were intended to protect the wearer from having direct skin contact with the patient's body or bodily fluids, and were not intended to provide sterility as a protection to the patient from contamination.  Holt Decl. ¶ 7.

Plaintiff did not ask Defendant Holt to let him see a doctor on January 21, 2011, or say anything to her about how she handled his bandaging.  Pl.'s Dep. 52:23-53:17.  Plaintiff was escorted back to his housing unit in a wheelchair.  Pl.'s Dep. 53:15-17.

At the time of the examination, Plaintiff did not see any problem with the care and treatment Defendant Holt provided.  Pl.'s Dep. 53:6-10.  Plaintiff named Defendant Holt as a defendant in this action because he believes that her actions contaminated his wound.  Pl.'s Dep. 143:2-17.

Plaintiff was examined by Defendant Ceballos at the 4A Clinic on January 25, 2011.  He complained that the incision site was draining.  Ceballos Decl. ¶ 4; Mathison Decl., Ex. B, at 5.

---

a January 20, 2011, Musculoskeletal Encounter Form.  Although the exhibit was not attached to her original declaration, she provided the exhibit in her resubmitted declaration, filed on July 17, 2015.  Again, as the Court already had the document, any omission was harmless.

[9]  Plaintiff objects to Exhibit B, attached to Mathison's Declaration.  The document is the Musculoskeletal Encounter form completed by Defendant Holt on January 20, 2011, which is also attached as Exhibit A to Defendant Holt's declaration. Plaintiff objects because there is a fax date stamp of December 21, 2010, at the top of the document.  However, Defendant Holt declares that the form is a true and correct copy of the form she completed.  Holt Decl. ¶ 4.  Plaintiff's objection is therefore overruled.

Plaintiff also told her that he had increased pain and decreased range of motion.  Pl.'s Second Decl. ¶ 13.[10]  Defendant Ceballos noted that Plaintiff was alert, sensory oriented, his skin was warm and dry, he had no shortness of breath and was not in distress.  She also noted that he had minor drainage, and that he had a doctor's appointment scheduled for January 31, 2011, for removal of the stitches.  Ceballos Decl. ¶ 4; Mathison Decl., Ex. B, at 5.  Defendant Ceballos performed a triage examination and changed Plaintiff's bandage.  She told Plaintiff that he was at risk for infection and instructed him to return for further evaluation if he experienced worsening drainage or signs or symptoms of infection, such as increased redness, increased swelling or the wound being hot to the touch.  Ceballos Decl. ¶ 4; Mathison Decl., Ex. B, at 5.

Defendant Ceballos telephoned Defendant Borbolla on January 25, 2011, inquiring about getting a wheelchair for Plaintiff.[11]  Ceballos Decl. ¶ 5; Borbolla Decl. ¶ 4.  Defendant Borbolla did not receive or process the Chrono and she was not aware of its existence.[12]  Borbolla Decl. ¶¶ 3-5.

On January 26, 2011, while being escorted from a dental appointment at the 4A Clinic by Defendants Torres and Rios, Plaintiff stumbled and fell to his knees.  As he started to go forward, one of the Defendants held him and stopped him from falling all the way down to the ground.  Defendants

---

[10]  Defendant Holt argues that there is no documentary evidence to support this contention.  However, Plaintiff's declaration is sufficient to support his statement as to what he told Defendant Ceballos.

[11]  In attempting to create a dispute as to whether the telephone call occurred, Plaintiff argues that Defendant Ceballos' statement is inconsistent with her responses to discovery, when she stated that she "did not recall" whether she had any conversations with other CSP officials about Plaintiff's need for a wheelchair.  Pl.'s Decl., Ex. 10.  However, in her declaration, Defendant Ceballos states that she had been informed and believes that she made the call to Defendant Borbolla.  Ceballos Decl. ¶ 5.  Indeed, Defendant Borbolla remembers receiving the call from Defendant Ceballos.  Borbolla Decl. ¶ 4.  Defendant Ceballos' statements are not inconsistent and Plaintiff incorrectly characterizes her discovery responses as denying that she made the call.  Plaintiff's argument fails to dispute the fact.

[12]  Plaintiff disputes Defendant Borbolla's statement that she did not receive or process the Chrono.  He states that when he filed an inmate appeal on the issue, "it was determined at that time that the Chrono was sent to Borbolla the ADA nurse at the time, who did not process it until after January 28, 2011."  ECF No. 244, at 17.  In support, he cites Exhibit B to his TAC, which is comprised of the decisions on his health care appeal.  At the Second Level, the reviewer determined that the Chrono "was sent to the ADA nurse, who processed it after the above noted dates."  ECF No. 207, at 61.  The document, however, does not state that Defendant Borbolla was the ADA nurse at the time, and Plaintiff cannot make such a conclusion based on the statement.  The fact is therefore undisputed.  The Court also notes that Defendants object to Exhibit B as being without foundation by personal knowledge or otherwise, unauthenticated and containing hearsay.  The Court need not rule on the objection because it is not relying on the document.

lifted Plaintiff back up.  Plaintiff's knee was sore and his left leg was dirty.  At the time, Plaintiff did not notice that anything else was different about his bandage or knee condition.  Plaintiff asked Defendants Torres and Rios to take him back to the clinic to change his bandage, but they said they were busy and did not have time.  Twenty minutes later, after returning to his cell, Plaintiff noticed blood on his bandage.  There was no blood at the time that he fell.  Pl.'s Dep. 97:10-101:25.

Defendant Abadia encountered Plaintiff in his cell on one or more occasions in early 2011 while making medication rounds.  Abadia Decl. ¶ 5.  The primary purpose of medication rounds was to distribute scheduled medication to inmates.[13]  Abadia Decl. ¶ 4.  Defendant Abadia's practice during rounds was to address all matters presented to her by an inmate that appeared to require medical attention.  If Plaintiff had requested Abadia to send him to the prison hospital or change his bandage, then she would have done so if the circumstances presented an immediate need for medical attention.  If Plaintiff made these requests and Defendant Abadia refused them, it would have been because the circumstances did not require immediate medical attention.  Abadia Decl. ¶¶ 4-5.

On February 1, 2011, Defendant Abadia changed Plaintiff's bandage during medication rounds.  On other occasions, Defendant Abadia gave Plaintiff bandage materials.[14]  Plaintiff has sued Defendant Abadia because he believes that she should have done more for him during the encounters.  Pl.'s Dep. 121:14-24 and 146:21-147:16.

A culture was taken from Plaintiff's left knee on February 2, 2011.  As of February 4, 2011, the culture came back positive for staph aureus.  Clark Decl. ¶ 12(e); Mathison Decl., Ex. B at 7-11.

---

[13]  Plaintiff attempts to dispute this by arguing that the LVNs also perform other tasks during medication rounds.  While this may be true, it does not contradict Defendant Abadia's statement that the *primary* purpose of rounds was to distribute medication.

[14]  In a Request for Judicial Notice, Plaintiff asks that the Court take judicial notice of Defendant Anderson's statement in her declaration supporting her motion for summary judgment that if she had provided Plaintiff with bandages, she would have breached the standard of care.  Plaintiff states that while he "appreciates the fact that [Defendant Abadia] provided him with bandage material," her actions (1) violated the standard of care; and (2) acknowledged that his bandage needed changing.  ECF No. 250, at 3.  Plaintiff is using various briefing methods to present new arguments to the Court.  While the Court can take judicial notice of its own records, Defendant Anderson's statement is an opinion, not a fact, and is not subject to judicial notice under Federal Rule of Evidence 201.  Plaintiff's request is therefore denied.

Staph aureus is a common bacteria that is part of the normal flora of many person's skin. Staph aureus is a known risk with any type of surgery.  Clark Decl. ¶ 13.

Plaintiff was admitted to San Joaquin Community Hospital and received treatment for his infection from February 2, 2011, to February 15, 2011.  This treatment included a second surgery to the left knee, performed by Dr. Alade on February 11, 2011.  Pl.'s Dep. 126:12-129:15.

Plaintiff's bandage was changed on February 18, 2011.  Pl.'s Dep. 133:3-6.

Defendant Ross encountered Plaintiff at his cell on February 19 and 20, 2011, while making medication rounds.  Ross Decl. ¶ 5.  On the first day, Plaintiff asked Defendant Ross to change his bandage.  Defendant Ross told Plaintiff that he would check as to whether there were any doctor's orders for bandage changes and get back to him.  Ross Decl. ¶ 5.

On February 21, 2011, Plaintiff's bandage was changed.  Plaintiff alleges that because Defendant Ross did not change the bandage the day before, the bandage had become more adhered to his wound and was therefore more painful when it was changed.  This is the only reason Defendant Ross is named as a Defendant.  Pl.'s Dep. 131:24-135:2.

On a couple of other occasions afterwards, Defendant Ross changed Plaintiff's bandage.  Pl.'s Dep. 131:24-135:2.

IV.   **DISCUSSION**

A.   Eighth Amendment

For claims arising out of medical care in prison, Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).

The existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's

13

daily activities, and/or the existence of chronic or substantial pain are indications of a serious medical need.  Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted).

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012) (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.  Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096) (internal quotation marks omitted).

    1.    *Bandage Changes*

        a.    Defendant Clark

It is undisputed that after Plaintiff's knee surgery on January 18, 2011, Dr. Alade wrote an order that Plaintiff's dressing be "kept clean and dry."  Third Amended Complaint, Ex. E.  Plaintiff returned to CSP on January 18, 2011, and was seen by Defendant Clark at the prison's hospital.  Plaintiff's condition was stable and he was scheduled to return to Dr. Alade in two weeks.  Defendant Clark wrote an order for medication, but he did not write an order for bandage changes.  Defendant Clark did not order a bandage change because it is his experience that orthopedic surgeons do not want to have the dressing changed or altered where the patient is to return to see the orthopedic surgeon for further follow-up care.

Plaintiff alleges that Defendant Clark told him that he was going to issue an order for bandage changes and that he doesn't know why he didn't do so.  Even viewing the evidence in the light most favorable to Plaintiff, however, there is no evidence of deliberate indifference.  Plaintiff's claim is that Defendant Clark failed to order bandage *changes*, but ordering bandage changes is different than recognizing that the dressing needs to be kept clean and dry, as ordered by Dr. Alade.  Plaintiff does not dispute Defendant Clark's explanation as to why he didn't order bandage changes, he simply

argues that Defendant Clark failed to do something that he allegedly said he would do.  Without more, this does not rise to the level of deliberate indifference.

b.     Defendant Ceballos

It is undisputed that Defendant Ceballos examined Plaintiff on January 25, 2011, and that he complained that (1) his incision site was draining, and (2) he had increased pain and decreased range of motion.  Defendant Ceballos noted that Plaintiff was alert, sensory oriented, his skin was warm and dry, he had no shortness of breath and was not in distress.  She also noted that he had minor drainage, and that he had a doctor's appointment scheduled for January 31, 2011.  Defendant Ceballos changed Plaintiff's bandage.  She also told him that he was at risk for infection and instructed him to return for further evaluation if he experienced worsening drainage or signs or symptoms of infection, such as increased redness, increased swelling or the wound being hot to the touch.

The parties dispute whether Plaintiff requested additional bandage changes and/or complained that other nurses were not changing his bandage when it was not clean or dry.  Defendant Ceballos states that under her practice, she would have noted the matter if Plaintiff had requested or raised the issue of further bandage changes.  Ceballos Decl. ¶ 6.  Plaintiff contends that he asked her to "direct, instruct, or order the LVN defendants to change [his] bandage if it was wet or dirty. . ." or schedule more frequent bandage changes.  Pl.'s Second Decl. ¶ 15.  Defendant Ceballos believes that since Plaintiff was scheduled to have his stitches removed on January 31, 2011, no further bandage changes were necessary or indicated before such time.  Ceballos Decl. ¶ 6.

The parties also dispute whether Plaintiff had signs or symptoms of an infection.  Defendant Ceballos did not note any signs or symptoms of an infection, but Plaintiff states that he had swelling and redness, in addition to the drainage.  Mathison Decl., Ex. B, at 5; Pl.'s Second Decl. ¶13.

Even if these facts are disputed, Plaintiff cannot demonstrate the existence of a material factual dispute.  Viewing the evidence in the light most favorable to Plaintiff, Defendant Ceballos examined Plaintiff, *changed his bandage,* and knew that he would be returning for suture removal in six days.  Therefore, even if Plaintiff complained that other nurses were not changing his bandage or he had

15

signs of an infection, Defendant Ceballos changed his bandage with the knowledge that Plaintiff would be returning for additional care in six days.  She also instructed Plaintiff to return if he had signs and symptoms of an infection.  Under these facts, there is no evidence to support a finding that Defendant Ceballos "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety." Farmer, 511 U.S. at 837.

To the extent that Plaintiff argues that Defendant Ceballos should have ordered other nursing staff to take action, and assuming that she had the authority to do so, the fact that she changed Plaintiff's bandage and knew that he would be seen in follow-up negates a finding that her failure to do so constituted deliberately indifference.

c.      Defendant Abadia

The parties do not dispute that Defendant Abadia encountered Plaintiff in his cell on one or more occasion in early 2011 while making medication rounds.  The primary purpose of medication rounds was to distribute scheduled medication to inmates, though LVNs also perform other activities during their rounds.  On February 1, 2011, Defendant Abadia changed Plaintiff's bandage during medication rounds.  On other occasions, Defendant Abadia gave Plaintiff bandage materials.  If Plaintiff requested that Defendant Abadia change his bandage, she would have done so if the circumstances presented a need for immediate medical attention.

Based on these undisputed facts, there is no evidence that Defendant Abadia was deliberately indifferent to Plaintiff's medical needs by refusing to change his bandages.  While Plaintiff believes she should have changed his bandages, Defendant Abadia states that she would have done so had the situation required immediate medication attention.  Even though Plaintiff may have wanted his bandage changed, her failure to do so does not mean that she was deliberately indifferent.  Indeed, Plaintiff testified during his deposition that he sued Defendant Abadia because he believes that she should have done more for him during their encounters.  Pl.'s Dep. 121:14-24 and 146:21-147:16.  "A difference of opinion between a physician and the prisoner - or between medical professionals -

16

concerning what medical care is appropriate does not amount to deliberate indifference." <u>Snow v.</u>
<u>McDaniel</u>, 681 F.3d 978, 987 (9th Cir. 2012) (internal citations omitted).

Plaintiff's belief that Defendant Abadia should have provided additional treatment, alone, is
not sufficient to demonstrate that she knew of a serious risk of harm and failed to prevent it.

> d.      Defendant Ross

The following facts are not disputed.  Defendant Ross encountered Plaintiff at his cell on
February 19 and 20, 2011, while making medication rounds.  On the first day, Plaintiff asked
Defendant Ross to change his bandage.  Defendant Ross told Plaintiff that he would check as to
whether there were any doctor's orders for bandage changes and get back to him.  On a couple of other
occasions after the February 19 and 20, encounters, Defendant Ross changed Plaintiff's bandage.

It is also undisputed that Plaintiff had his bandage changed on February 18, 2011, and then
again on February 21, 2011.  Plaintiff alleges that during the February 21, 2011, bandage change, the
bandage had become "more adhered" to his wound because Defendant Ross did not change the
bandage on February 20, 2011.  This is the only reason that Plaintiff named Defendant Ross as a
Defendant.

The parties dispute the extent of the injuries that can be attributed to Defendant Ross, with
Plaintiff arguing that in addition to the bandage becoming more adhered to his wound, he also suffered
pain, stress, psychological damage and fear of getting another infection.

The parties also dispute whether Defendant Ross actually checked for the bandage order.
Defendant Ross states that he checked at the yard clinic, did not locate any bandage orders and called
the prison hospital to request that they fax any orders to the clinic.  Ross Decl. ¶ 5.  Plaintiff, however,
states that Defendant Ross told him that he had forgotten to check.

These disputes, however, are not dispositive of his claim.  While the Court agrees that his
injuries appear minimal, the undisputed evidence negates a finding that Defendant Ross acted with
deliberate indifference when he did not change Plaintiff's bandage on February 20, 2011.  Plaintiff
told Defendant Ross that he needed to have his bandage changed, and in response, Defendant Ross

told him that he would check to see if there were any orders for a bandage change and get back to him. Even if Defendant Ross forgot, as Plaintiff alleges he did, "forgetting" to do something does not rise to the level an Eighth Amendment violation.  Deliberate indifference requires a *purposeful* act, or failure to act.  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

2.    *Wheelchair Chrono*

a.    Defendant Holt[15]

It is undisputed that Plaintiff arrived to his appointment with Defendant Holt in a wheelchair, and left the appointment in a wheelchair.

The parties dispute, however, whether Plaintiff asked Defendant Holt to issue him a wheelchair from the 4A Clinic.  Plaintiff states that he told her that he needed a wheelchair and that custody made him walk to the clinic, but Defendant Holt told him that he did not need one.  Pl.'s Second Decl. ¶ 9.  Defendant Holt denies this, stating that if he had asked her for a wheelchair, she would have noted it.  Holt Decl. ¶5; Mathison Decl., Ex B, at 4.

The parties also dispute whether Defendant Holt had a duty or responsibility to issue the wheelchair.  Defendant Holt states that as the triage nurse, it was not her duty to provide Plaintiff with a wheelchair.  She also states that it was her practice to refer wheelchair issues to the ADA Office.  Holt Decl. ¶ 5.  Plaintiff believes that Defendant Holt had a duty to either issue a wheelchair or make sure that one was issued because, as a clinic nurse, she was responsible for the 4A nursing operations and the activities of the 4A Plata LVN.  Pl.'s Decl. ¶ 9.  Plaintiff also cites Defendant Holt's discovery

---

[15]  To the extent that Plaintiff argues that Defendant Holt's bandage change or failure to send him for further treatment violates the Eighth Amendment, the Court's screening order found that these contentions did not state a claim under the Eighth Amendment.  ECF No. 15, at 12.  Plaintiff may not expand the scope of his claim in opposing summary judgment. E.g., Fossen v. Blue Cross and Blue Shield of Montana, Inc., 660 F.3d 1102, 1115 (9th Cir. 2011); Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1079-80 (9th Cir. 2008).

response, which states that she "had the authority to issue a wheelchair to Plaintiff to the extent there was a physician's order for a wheelchair that was made known to her."  ECF No. 243-1, at 31.

Even assuming that Plaintiff asked Defendant Holt for a wheelchair, and that she had a duty and the authority to issue one, the undisputed evidence does not support a finding that Defendant Holt acted with deliberate indifference.  It is undisputed that Plaintiff both arrived to the appointment in a wheelchair, and left in a wheelchair.  It is also undisputed that Defendant Holt did not ask about the wheelchair that Plaintiff had at the time.  Defendant Holt therefore knew that Plaintiff had a wheelchair at the time that he requested one.  While Plaintiff may have liked her to take additional actions, the fact that he had the very item he requested eliminates the possibility that Defendant Holt acted with deliberate indifference in allegedly denying his request.

b.      Defendants Ceballos and Borbolla

It is undisputed that Defendant Ceballos examined Plaintiff on January 25, 2011.  It is also undisputed that on January 25, 2011, Defendant Ceballos telephoned Defendant Borbolla to inquire about a wheelchair for Plaintiff.  Defendant Borbolla did not provide care to Plaintiff.

The remaining factual issues related to their involvement in the wheelchair request are disputed.  Defendant Borbolla states that shortly after the telephone call on January 25, 2011, she located a wheelchair and brought it to Plaintiff's cell.  Borbolla Decl. ¶ 4.  Defendant Borbolla states that she told Plaintiff that she was providing the wheelchair for Plaintiff to use as long as he needed it.  Borbolla Decl. ¶ 4.  Plaintiff denies that Defendant Borbolla came to his cell on January 25, 2011, citing the log for his housing unit for January 25, 2011, that shows that she did not sign in on that date.  Pl.'s Decl., Ex. 12.  Plaintiff also cites Defendant Borbolla's responses to discovery, in which she states that (1) she recalls going to Plaintiff's cell for the purpose of giving him a wheelchair, but doesn't remember the date or whether it was in January 2011; and (2) that it was her usual practice as the ADA nurse to have an inmate complete and sign a form when providing an inmate with a wheelchair, but she doesn't remember having Plaintiff do so in this instance.  Pl.'s Decl., Ex. 6.  She

continued, however, that it was possible that she provided him with a wheelchair without having him sign the form.  Pl.'s Decl., Ex. 6.

As to Defendant Ceballos, it is undisputed that she made a phone call in an attempt to help Plaintiff, which negates a finding that she acted with deliberate indifference.

Turning to Defendant Borbolla, whether or not she actually went to Plaintiff's cell, Plaintiff provides no evidence to dispute her contention that she located a wheelchair for Plaintiff after her conversation with Defendant Ceballos.  So, even if she failed to ultimately provide Plaintiff with the wheelchair, the evidence shows that she located a wheelchair, and there is no evidence to suggest that her failure to provide it to Plaintiff was done with the required state of mind.  It is also undisputed that Defendant Borbolla did not know about the Chrono, which also precludes a finding that she acted with deliberate indifference.

c.      Defendants Rios and Torres

Plaintiff's claim against Defendants Rios and Torres is based on his allegation that they knew he needed a wheelchair during his January 26, 2011, escort, but they told Plaintiff that they didn't bring one with them and they did not know of any orders.  During the escort, he fell and allegedly injured his knee.

The following facts are undisputed.  On January 20, 2011, Plaintiff was escorted to the 4A Clinic by Defendants Rios and Torres.  Plaintiff told them that Defendant Clark had ordered a wheelchair, but it had not yet been issued.  Plaintiff asked Defendants to use a wheelchair for the escort.  Defendants Rios and Torres told Plaintiff that he could not use a wheelchair because he did not have a copy of his Chrono.

It is also undisputed that on January 26, 2011, while being escorted from a dental appointment at the 4A Clinic by Defendants Torres and Rios, Plaintiff stumbled and fell to his knees.  As he started to go forward, one of the Defendants held him and stopped him from falling all the way down to the ground.  Defendants lifted Plaintiff back up.  Plaintiff's knee was sore and his left leg was dirty.  At the time, Plaintiff did not notice that anything else was different about his bandage or knee condition.

Plaintiff asked Defendants Torres and Rios to take him back to the clinic to change his bandage, but they said they were busy and did not have time.  Twenty minutes later, after returning to his cell, Plaintiff noticed blood on his bandage.  There was no blood at the time that he fell.

Finally, it is undisputed that Defendants Rios and Torres have received training on the appropriate procedures and requirements for escorting inmates within CSP.  In order for an inmate to use a wheelchair during an escort, the inmate is required to have a valid Chrono.  Chronos or copies of Chronos are provided to inmates by medical staff in a process that is outside of the scope of Rios' and Torres' duties and responsibilities as correctional officers.  If an inmate had a Chrono, but did not actually have a wheelchair at his cell, then the inmate was authorized to be escorted by wheelchair and Rios or Torres would go to the clinic or another location to locate a wheelchair for use during the escort.[16]

When Defendants Rios and Torres arrive at an inmate's cell for an escort, they are ready to proceed with moving the inmate.  If an inmate did not have a Chrono for a wheelchair but requested to use one, whether or not Defendants Rios or Torres would attempt to locate one depended on the particular circumstances existing at the time of the escort.  The escort would be delayed if Defendants attempted to locate a wheelchair and/or verify a Chrono.  Defendants state that this delay may jeopardize the time for Defendants to complete other required tasks, or the timing for the event to which the inmate is being escorted, which in turn may raise safety or security issues for Defendants, inmates and staff.  If the circumstances were such that Defendants believed it would be appropriate to attempt to locate a wheelchair, they would do so.  If an inmate refused to be escorted because he did not have a wheelchair, then the inmate was permitted to remain in his cell.  Inmates were never forced to walk to an appointment if they chose not to do so.

Given these undisputed facts, Defendants argue that Plaintiff cannot show that they acted with deliberate indifference in refusing a wheelchair because they simply implemented the relevant policies

---

[16]  Plaintiff states that he is unable to admit or deny portions of this fact without additional discovery, but he has not made a proper request for discovery under Rule 56(d).  These facts are therefore undisputed.

and procedures.  They also argue that they actually assisted Plaintiff when he fell, and that any injuries were de minimis.

In response, Plaintiff argues that Defendants could have called to confirm whether or not Plaintiff had a wheelchair.  However, what they *could have done* does not have any bearing on whether their actions constituted deliberate indifference.  There is no dispute that Defendants could have attempted to locate a wheelchair even where Plaintiff did not have a Chrono, but it is also undisputed that whether they did depended on the particular circumstances.  While Defendants are unable to state what particular circumstances existed during the escort, it is undisputed that they followed the policy and practice in place at the time.  Plaintiff has not provided any evidence to the contrary.

Plaintiff also argues that he was made to decide between an escort without a wheelchair, or remaining in his cell and refusing his appointment, and that this choice in and of itself was unconstitutional.  That Plaintiff may have had to make this choice is not relevant to Defendants' actions.

Therefore, the Court finds that the undisputed evidence precludes a finding that Defendants Rios and Torres acted with deliberate difference.

3.      *Further Treatment*

a.      Defendant Ceballos

In analyzing Plaintiff's claim that Defendant Ceballos failed to order bandage changes, the Court found that even viewing the evidence in the light most favorable to Plaintiff, there was no evidence to create a dispute of material fact.  For this claim, the undisputed evidence remains the same.  Defendant Ceballos examined Plaintiff, changed his bandage, and knew that he would be returning for suture removal in six days.  She also instructed Plaintiff to return if he had signs and symptoms of an infection.

In his opposition, Plaintiff suggests that his wound was not healing and that even if it was not infected when Defendant Ceballos examined him, "it was obvious that something was wrong."  ECF

No. 244, at 20.  This is Plaintiff's opinion, and it has no bearing upon whether Defendant Ceballo's failure to send him to the hospital was deliberately indifferent.  "A difference of opinion between a physician and the prisoner - or between medical professionals - concerning what medical care is appropriate does not amount to deliberate indifference."  Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)).

Based on the undisputed facts, there is no evidence to support a finding that Defendant Ceballos "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety."  Farmer, 511 U.S. at 837.

b.      Defendant Abadia

As the Court has noted above, the undisputed facts show that Defendant Abadia encountered Plaintiff in his cell on one or more occasion in early 2011 while making medication rounds.  The primary purpose of medication rounds was to distribute scheduled medication to inmates, though LVNs also perform other activities during their rounds.  If Plaintiff requested that Defendant Abadia send him for further treatment, she would have done so if the circumstances presented a need for immediate medical attention.

Plaintiff contends that Defendant Abadia refused to send Plaintiff for further treatment several times, including on January 27, 2011, when he complained of increased pain, decreased range of motion, vomiting and chills.  Pl.'s Second Decl. ¶ 19.  However, his belief that he required more treatment is not dispositive.  Defendant Abadia states that she would have sent Plaintiff for further treatment had the situation required immediate medical attention.  Plaintiff's disagreement with her decision is nothing more than a difference of opinion and it is not sufficient to demonstrate that she knew of a serious risk of harm and failed to prevent it.  Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (internal citations omitted).

4.     *Causation*

In a section 1983 action, a plaintiff must also establish that the defendant's conduct was the actionable cause of the claimed injury.  Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).  Defendants argue that Plaintiff cannot establish causation on two basis: (1) the development of his infection based on timing; and (2) the fact that it is a common infection and can occur even with proper care and treatment.

As to the former, Defendants argue that Plaintiff did not have any signs or symptoms of an infection prior to January 28, 2011, and given that a staph aureus infection takes 48 to 72 hours to develop, Defendants' acts or omissions could not have led to the February 4, 2011, positive culture. However, whether Plaintiff had signs and symptoms of an infection is disputed, and this argument therefore fails.

With regard to Defendants' argument that Plaintiff's infection can occur even with proper treatment, Defendants present the opinion of Defendant Clark.  He explains that a staph aureus infection can occur notwithstanding proper treatment during and after surgery.  Therefore, Plaintiff's development of a staph aureus infection in no way establishes that his care and treatment was below the standard of care.  Clark Decl. ¶ 13.

Plaintiff attempts to deny this, but he also admits that his infection can occur even with proper care and treatment.  Plaintiff presents no evidence to dispute Defendant Clark's statement.

Based on the above analysis, the Court finds that summary judgment should be granted in favor of Defendants Holt, Borbolla, Ceballos, Rios, Torres, Clark, Abadia and Ross on Plaintiff's Eighth Amendment claim.

B.     Medical Negligence

Under California law, the elements of a claim for professional negligence, also referred to as medical malpractice, are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual

loss or damage resulting from the professional's negligence." <u>Johnson v. Superior Court</u>, 143 Cal.App.4th 297, 305 (2006).

The general rule applicable in negligence cases arising out of the rendering of professional services is that the applicable standard of care is a matter "peculiarly within the knowledge of experts . . ." <u>Flowers v. Torrance Mem'l Hosp. Med. Ctr.</u>, 8 Cal.4th 992, 1001 (1994); <u>see also</u> <u>Johnson</u>, 143 Cal.App.4th at 305.  Therefore, in order to prevail, a plaintiff must offer an expert's opinion to prove a duty owed, breach of that duty, or to show that the defendant's alleged negligence was the proximate cause of the plaintiff's alleged injury.  <u>See Bushling v. Fremont Med. Ctr</u>., 117 Cal.App.4th 493, 510, 11 Cal.Rptr.3d 653 (2004); <u>Jennings v. Palomar Pomerado Health Systems,</u> <u>Inc</u>., 114 Cal.App. 4th 1108, 1118 (2003); <u>see</u> <u>also</u> <u>Johnson v. United States</u>, 2012 WL 1094322, *12 (N.D.Cal. 2012) (granting summary judgment to defendant on malpractice claim because plaintiff failed to provide expert testimony or evidence to establish that defendant's alleged breach of applicable standard of care caused his injuries).

Plaintiff argues first that expert testimony is not required because neither the jury nor the Court would need assistance in deciding the issues.  The Court disagrees.  Expert testimony is not required if "the conduct required by the particular circumstances is within the common knowledge of the layman." <u>Flowers</u>, 8 Cal.4th at 1001.  The "common knowledge" exception is "principally limited to situations in which the plaintiff can invoke the doctrine of res ispa loquitor, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'" <u>Id</u>. (internal citations omitted).

Plaintiff argues that the issues are more related to prison policies than medical care standards, but his characterization is not persuasive.  Defendants acknowledge that prison policies may be a factor in certain claims, but they argue that this does not change the nature of the claims.  Indeed, this is an action involving Plaintiff's care after surgery, and while there may have been orders for certain care, it does not change the fact that the decisions were made by medical professionals and involved

medical judgments.  Here, a layperson would not, as a matter of common knowledge, know whether Defendants should have changed Plaintiff's bandages, sent Plaintiff immediately to the prison hospital, or provided him with a wheelchair.  These questions are purely medical issues for which expert testimony is necessary.[17]

1.    *Bandage Changes*

a.    Defendant Clark

It is undisputed that after Plaintiff's knee surgery on January 18, 2011, Dr. Alade wrote an order that Plaintiff's dressing be "kept clean and dry."  Third Amended Complaint, Ex. E.  Plaintiff returned to CSP on January 18, 2011, and was seen by Defendant Clark at the prison's hospital. Plaintiff's condition was stable and he was scheduled to return to Dr. Alade in two weeks.  Defendant Clark wrote an order for medication, but he did not write an order for bandage changes.  Defendant Clark did not order a bandage change because it is his experience that orthopedic surgeons do not want to have the dressing changed or altered where the patient is to return to see the orthopedic surgeon for further follow-up care.

In Defendant Clark's opinion, his treatment complied with the professional standard of care at all times.  Clark Decl. ¶ 11.  Plaintiff disputes this, arguing that Defendant Clark was negligent in ignoring the orders of Dr. Alade.  However, as the Court noted earlier, ordering bandage changes is different than recognizing that the dressing needs to be kept clean and dry, as ordered by Dr. Alade.

As noted above, Defendant Clark also explains that a staph aureus infection can occur notwithstanding proper treatment during and after surgery.  Therefore, Plaintiff's development of a staph aureus infection in no way establishes that his care and treatment were below the standard of care.  Clark Decl. ¶ 13.

---

[17]  In support of his argument, Plaintiff cites <u>Chacon v. Gallion</u>, 2008 WL 5391050 (N.D. Cal, 2008), a case which involved nurses' handling of very clear discharge requirements, i.e., provision of medication and gauze pads.  <u>Chacon</u> involved a total breakdown of procedures, staff who had not informed themselves of the applicable procedures, and a total lack of medical care for two days post-surgery.  This Court is not bound by the decision in <u>Chacon</u>.  Regardless, Plaintiff's case is distinguishable, as he was properly processed and received medical treatment upon his return from surgery.

Plaintiff attempts to dispute this, arguing that even if it can occur with proper treatment, "that is not an excuse to provide bad care and treatment which arguably would increase a person's chances of developing" the infection.  Plaintiff's statement is an unsupported opinion, however, and does not render Defendant Clark's statement disputed.  In fact, Plaintiff admits that the fact that he developed the infection in and of itself, in no way establishes that the care and treatment were below the standard of care.

Plaintiff has not provided expert testimony to dispute Defendant Clark's statement that his treatment complied with the professional standard of care.  He has also failed to dispute Defendant Clark's statement that the infection can occur even with proper care and treatment, which negates a finding of causation.

b.       Defendant Ceballos

It is undisputed that Defendant Ceballos examined Plaintiff on January 25, 2011, and that Plaintiff complained that his incision site was draining, and that he had increased pain and decreased range of motion.  Defendant Ceballos noted that Plaintiff was alert, sensory oriented, his skin was warm and dry, he had no shortness of breath and was not in distress.  She also noted that he had minor drainage, and that he had a doctor's appointment scheduled for January 31, 2011.  Defendant Ceballos changed Plaintiff's bandage.  She also told him that he was at risk for infection and instructed him to return for further evaluation if he experienced worsening drainage or signs or symptoms of infection, such as increased redness, increased swelling or the wound being hot to the touch.

Defendant Ceballos opined that she provided an appropriate triage examination on January 25, 2011, and met the standard of care.  Ceballos Decl. ¶¶7-8.  Plaintiff denies this, but does not support his opinion with proper evidence.  Therefore, even if it is disputed whether Plaintiff requested additional bandage changes, or had signs or symptoms of an infection, Plaintiff has not provided sufficient evidence to dispute her statement that her treatment met the standard of care.  Plaintiff also fails to dispute Defendant Clark's expert opinion that the infection can occur even with proper treatment, which negates a finding of causation.

c.      Defendant Abadia

The parties do not dispute that Defendant Abadia encountered Plaintiff in his cell on one or more occasions in early 2011 while making medication rounds.  On February 1, 2011, Defendant Abadia changed Plaintiff's bandage during medication rounds.  On other occasions, Defendant Abadia gave Plaintiff bandage materials.  If Plaintiff requested that Defendant Abadia change his bandage, she would have done so if the circumstances presented a need for immediate medical attention.

Defendant Abadia opines that her conduct and decisions met the standard of care.  Abadia Decl. ¶¶ 4-5.  Plaintiff denies this, but his own lay opinion is insufficient to create a dispute.

Plaintiff also fails to dispute Defendant Clark's opinion that the infection can occur even with the proper treatment, which negates a finding of causation.

d.      Defendant Ross

Defendant Ross encountered Plaintiff at his cell on February 19 and 20, 2011, while making medication rounds.  Plaintiff had his bandage changed on February 18, 2011, and then again on February 21, 2011.  Plaintiff alleges that during the February 21, 2011, bandage change, the bandage had become "more adhered" to his wound because Defendant Ross did not change the bandage on February 20, 2011.

Defendant Ross opines that his actions during his encounters with Plaintiff met the professional standard of care.  Ross Decl. ¶¶4-5.  Plaintiff attempts to dispute this by arguing that Defendant Ross refused to change his bandage on February 19 and 20, 2011, and even if he changed it on February 19, he would have still have had to change it on February 20 because the order was for daily bandage changes.  First, Plaintiff is incorrect that the order was for daily bandage changes- the order directed that his bandage be kept clean and dry.  Second, Plaintiff's lay opinion is insufficient to create a dispute of fact.

Finally, Plaintiff fails to dispute Defendant Clark's opinion that the infection can occur even with the proper treatment, which negates a finding of causation.

e.      Defendant Holt

On January 20, 2011, Defendant Holt examined the incision site, and wore non-sterile, disposable gloves during her examination.  It was her practice, and a standard practice for nurses working as the clinic triage nurse, to wear these gloves at all times during an examination.  The gloves were intended to protect the wearer from having direct skin contact with the patient's body or bodily fluids, and were not intended to provide sterility as a protection to the patient from contamination.  Holt Decl. ¶ 7.  At the time of the examination, Plaintiff did not see any problem with the care and treatment Defendant Holt provided.  Pl.'s Dep. 53:6-10.

The parties dispute whether Defendant Holt pulled out a stitch during her examination.  She argues that had she done so, she would have noted it in the progress notes.  Holt Decl. ¶ 6.  Plaintiff argues that while the stitches were initially intact, Defendant Holt pulled one out accidentally when unwrapping the dressing.[18]  Pl.'s Second Decl. ¶8.  He also contends that she did not put on a fresh bandage, but rather reapplied the same old bandage to the wound.  Pl.'s Second Decl. ¶ 11.

The parties also dispute whether Defendant Holt touched his wound with her gloves.  Plaintiff contends that she made notes, flipped through Plaintiff's chart and answered the phone.  He also contends that she touched his incision when Plaintiff pointed out to her that she pulled out a stitch.  Pl.'s Second Decl. ¶ 11.  Defendant Holt, however, states that it was not her standard practice to use the phone, make notes or touch desk items during an examination, and she has no reason to believe that she did so during Plaintiff's examination.  She does not recall touching Plaintiff's incision site with her gloved fingers, and there would have been no reason for her to have done so.  Holt Decl. ¶ 7.

Even viewing this dispute in the light most favorable to Plaintiff, he has failed to provide expert evidence to contradict Defendant Holt's opinion that she provided an appropriate triage examination on January 20, 2011, and that her examination met the professional standard of care.  Holt Decl. ¶ 8.  Plaintiff denies that her treatment met the standard of care and believes that her actions

---

[18]  Contentions set forth in verified pro se pleadings, motions, and/or oppositions constitute evidence where the contentions are based on personal knowledge of facts admissible in evidence.  Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).

may have contaminated his bandage and wound.  Pl.'s Second Decl. ¶ 11.  However, Plaintiff's lay opinion is insufficient to dispute Defendant Holt's contention.  It is also insufficient to dispute Defendant Clark's statement that this infection can occur despite proper care and treatment, which negates a finding of causation.

   2.   *Wheelchair Chrono*

      a.   Defendant Holt

It is undisputed that Plaintiff arrived to his appointment with Defendant Holt in a wheelchair, and left the appointment in a wheelchair.  It is also undisputed that Defendant Holt did not ask about the wheelchair that he was using.

The parties dispute, however, whether Plaintiff asked Defendant Holt to issue him a wheelchair, and whether she had a duty and responsibility to issue one.  However, even given these disputes, the undisputed evidence shows that Plaintiff had a wheelchair when he asked Defendant Holt for one.  Plaintiff is also unable to dispute Defendant Clark's opinion that the infection can occur even with proper care and treatment, which negates a finding of causation.

      b.   Defendants Ceballos and Borbolla

It is undisputed that Defendant Ceballos examined Plaintiff on January 25, 2011.  It is also undisputed that on January 25, 2011, Defendant Ceballos telephoned Defendant Borbolla to inquire about a wheelchair for Plaintiff.  Defendant Borbolla did not provide care to Plaintiff.

As to Defendant Ceballos, it is undisputed that she followed-up on Plaintiff's request.  She also opines that her treatment met the standard of care.  Ceballos Decl. ¶¶7-8.  Plaintiff fails to provide testimony to dispute this.  He also fails to dispute Defendant Clark's opinion that the infection can occur even with proper care and treatment, which negates a finding of causation.

As to Defendant Borbolla, the parties dispute whether Defendant Borbolla actually brought the wheelchair to Plaintiff's cell.  It is undisputed, however, that she located a wheelchair for Plaintiff after her conversation with Defendant Ceballos.  If she failed to get the wheelchair to Plaintiff, there is still no evidence that her failure to do so caused any of Plaintiff's injuries.

c.      Defendant Clark

It is undisputed that when Plaintiff saw Defendant Clark on January 18, 2011, he wrote out and approved a Chrono for Plaintiff's use of a wheelchair until February 2, 2011.

It is also undisputed that Defendant Clark did not give Plaintiff a copy of the Chrono. However, whether or not he had a duty to do so is disputed.  Defendant Clark states that it was not his duty or responsibility to provide Plaintiff with a wheelchair for future use or to provide Plaintiff with a copy of the Chrono.  Clark Decl. ¶ 10.  Plaintiff denies this and believes that it was the CMO's responsibility to ensure that Plaintiff was provided with the items prior to being released back to his housing.  In his second declaration, he states that he filed an appeal and Dr. Theil's response "states or indicates that Dr. Clark should have provided Plaintiff with a copy of the Chrono."  Pl.'s Second Decl. ¶ 3.[19]

Again, even assuming that Defendant Clark should have given Plaintiff a copy of the Chrono, Plaintiff fails to provide any evidence that his failure to do so caused any injuries.

3.      *Failure to Provide Treatment*

a.      Defendant Ceballos

Defendant Ceballos examined Plaintiff on January 25, 2011, and changed his bandage.  She noted that Plaintiff was alert, sensory oriented, his skin was warm and dry, he had no shortness of breath and was not in distress.  She also noted that he had minor drainage, and that he had a doctor's appointment scheduled for January 31, 2011.  Defendant Ceballos also told him that he was at risk for infection and instructed him to return for further evaluation if he experienced worsening drainage or signs or symptoms of infection, such as increased redness, increased swelling or the wound being hot to the touch.

Defendant Ceballos opined that she provided an appropriate triage examination on January 25, 2011, and met the standard of care.  Ceballos Decl. ¶¶7-8.  Plaintiff denies this, arguing that she

---

[19] Defendants object to the appeal response, attached to Plaintiff's TAC as Ex. B.  The Court is not relying on the document, however.

should have sent him to the prison doctor where she was aware of Plaintiff's symptoms and admitted he was at risk of an infection.  Again, however, Plaintiff's testimony is insufficient to establish the standard of care and it does not render Defendant Ceballo's opinion disputed.  Plaintiff also fails to dispute Defendant Clark's expert opinion that the infection can occur even with proper treatment, which negates a finding of causation.

>           b.      Defendant Abadia

Defendant Abadia encountered Plaintiff in his cell on one or more occasions in early 2011 while making medication rounds.  If Plaintiff requested that Defendant Abadia send him for further treatment, she would have done so if the circumstances presented a need for immediate medical attention.

Defendant Abadia opines that her conduct and decisions met the standard of care.  Abadia Decl. ¶¶ 4-5.  Plaintiff denies this, but he does not support his denial with any evidence.  As the Court noted in the analysis of the Eighth Amendment claim, Plaintiff's claim against Defendant Abadia is based on his belief that she should have done more.  His belief, however, is insufficient to establish a standard of care to dispute Defendant Abadia's opinion.  Plaintiff also fails to dispute Defendant Clark's expert opinion that the infection can occur even with proper treatment, which negates a finding of causation.

Based on the above, the Court finds that summary judgment should be granted in favor of Defendants Holt, Borbolla, Ceballos, Clark, Abadia and Ross on Plaintiff's medical negligence claim.

>   D.      QUALIFIED IMMUNITY

Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).

In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation

can be made out, the next step is to ask whether the right was clearly established.  Id.  In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

As the Court has found that Defendants did not violate a constitutional right, it need not further discuss the issue of qualified immunity.

**V.     FINDINGS AND RECOMMENDATIONS**

For the reasons set forth above, the Court HEREBY RECOMMENDS that summary adjudication be GRANTED in favor of Defendants Abadia, Ceballos, Borbolla, Holt, Rios, Ross, Clark and Torres on the Eighth Amendment claim, and in favor of Defendants Adabia, Ceballos, Borbolla, Holt, Ross and Clark on the medical negligence claims.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections must be filed within fourteen (14) days from the date of service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __**July 1, 2015**__                              ___ /s/ Dennis L. Beck___
                                                         UNITED STATES MAGISTRATE JUDGE